UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DANIEL PHILLIPS,**<br><br>  Plaintiff,<br><br>  v.<br><br>**UNITED STATES NUCLEAR REGULATORY COMMISSION,**<br><br>  Defendant. | Civil Action No. 24-1999 (JEB) |

## MEMORANDUM OPINION

Around 2013, Plaintiff Daniel Phillips, along with many others, applied for a job at the U.S. Nuclear Regulatory Commission. A year later, he began receiving notifications that his personally identifiable information was present on the dark web. He then battled — for over a decade — frequent attempts by unknown actors to open and hack into accounts in his name. It was not until 2024 that Phillips and other NRC applicants learned the potential source of this havoc: the agency, it confessed, had inadvertently posted their PII on an internal site without proper access restrictions, allowing their materials to be viewable by thousands of NRC employees.

In response to that unwelcome news, Plaintiff filed this class-action suit against the NRC for its failure to safeguard the PII of job applicants in violation of the Privacy Act. He asserts that the posting both exposed them to an extremely high risk of fraud, which they have spent resources mitigating, and reduced the value of their PII. The NRC now moves to dismiss,

1

contending that Plaintiff and the proposed class have neither established standing nor stated a claim for relief under the Privacy Act.

Although both the jurisdiction and merits questions present fairly involved inquiries, the Court resolves the former in Plaintiff's favor and the latter for Defendant. Because Phillips has not sufficiently alleged willful or intentional conduct, the NRC garners dismissal.

**I.      Background**

The NRC is a government agency that "ensure[s] the safe use of radioactive materials for beneficial civilian purposes while protecting people and the environment." About NRC, NRC (Feb. 4, 2025), https://www.nrc.gov/about-nrc.html. When Plaintiff applied for a job there around 2013 — which he did not end up taking — he was required to provide his PII and resumé. See ECF No. 1 (Compl.), ¶ 27. The information in those documents included his name, address, phone number, email address, citizenship status, and Social Security number. Id., ¶ 34.

One year after he submitted that application, Phillips began receiving notifications that his PII was present on the dark web. Id., ¶ 29. From that point on, he struggled against a barrage of identity-theft efforts. Id., ¶¶ 62–63. The source of these ills was ultimately discovered in June 2024 when Plaintiff and other NRC applicants received an email from the agency stating that their PII and resumés submitted as part of the application process had

> mistakenly [been] placed on the internal NRC SharePoint site without proper access restrictions, most likely in 2013. The document[s] w[ere] generally accessible to personnel working at the NRC, instead of only accessible to NRC personnel with a need to know the information and remained on the SharePoint site longer than the NRC needed to retain [them]. The document[s] w[ere] removed from the site on April 8, 2024, after discovery of the mistake.

Id., ¶ 6. The Commission employs almost 3,000 people, all of whom had access to this information. Id., ¶ 3. To mitigate any risks brought on by this exposure, the agency suggested that applicants obtain a free credit report from each of the three national credit bureaus. Id., ¶ 36.

Phillips's suit, filed a month after this notification, alleges that the Commission's failure to secure his and proposed class members' data violates the Privacy Act. Id., ¶¶ 81–92. He requests monetary damages as well as injunctive and declaratory relief on behalf of himself and the proposed class. Id. at 21–22. Defendant now moves to dismiss.

**II.     Legal Standard**

The NRC seeks dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). When a defendant files a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, the plaintiff generally "bears the burden of establishing jurisdiction by a preponderance of the evidence." Bagherian v. Pompeo, 442 F. Supp. 3d 87, 91–92 (D.D.C. 2020) (quoting Didban v. Pompeo, 435 F. Supp. 3d 168, 172–73 (D.D.C. 2020)); see Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992). The court "assume[s] the truth of all material factual allegations in the complaint and 'construe[s] the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.'" Am. Nat'l Ins. Co. v. FDIC, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting Thomas v. Principi, 394 F.3d 970, 972 (D.C. Cir. 2005)).

To survive a motion to dismiss under Rule 12(b)(6), conversely, a complaint must "state a claim upon which relief can be granted." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 552 (2007). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, id. at 555, "a complaint must contain sufficient factual matter, [if] accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). While a plaintiff may survive a Rule 12(b)(6) motion even

if "recovery is very remote and unlikely," Twombly, 550 U.S. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)), the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." Id. at 555.

### III.     Analysis

In seeking dismissal, Defendant first contends that Plaintiff (individually, or as a future class representative) lacks standing because he has not suffered any actual injuries. The NRC alternatively argues that, even if the Court finds that standing exists, Phillips has failed to state a sound claim under the Privacy Act. The Court begins, as it must, with the jurisdictional question before discussing the merits.

####   A.     Standing

Article III of the Constitution limits the jurisdiction of the federal courts to resolving "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. By doing so, "[t]he law of Article III standing . . . serves to prevent the judicial process from being used to usurp the powers of the political branches." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013).

A party's standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan, 504 U.S. at 560. To have standing, a party must, at a constitutional minimum, meet the following criteria. First, the plaintiff "must have suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." Id. (quotation marks and citations omitted). Second, "there must be a causal connection between the injury and the conduct complained of — the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" Id. (citations omitted). Third, "it must be 'likely,' as opposed to merely

'speculative,' that the injury will be 'redressed by a favorable decision.'" Id. at 561 (citation omitted). "[A]t the pleading stage, the complaint must 'state a plausible claim that each element of standing is satisfied.'" Humane Soc'y of U.S. v. Perdue, 935 F.3d 598, 602 (D.C. Cir. 2019) (quoting Hancock v. Urban Outfitters, Inc., 830 F.3d 511, 513 (D.C. Cir. 2016)); see also Parker v. District of Columbia, 478 F.3d 370, 377 (D.C. Cir. 2007), aff'd on other grounds sub nom. District of Columbia v. Heller, 554 U.S. 570 (2008). A "deficiency on any one of the three prongs suffices to defeat standing." U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).

Plaintiff seeks monetary damages — which are authorized by the Privacy Act — for four alleged harms: (1) an increased risk of identity theft, (2) the time and money that he expended on credit-repair activities, (3) the disclosure of his PII, and (4) a diminution of his PII's market value. See Compl., ¶¶ 64, 92. He also demands injunctive and declaratory relief. Id., ¶ 15. The Court addresses standing for each form of relief in turn. See DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 335 (2006) ("[A] plaintiff must demonstrate standing separately for each form of relief sought.").

    1.    *Monetary Damages*

        a.    Injury in Fact

Phillips claims that he has been injured by the "imminent and significant risk of identity theft, financial fraud, and other identity-related fraud into the indefinite future." Compl., ¶ 9; see also id., ¶¶ 64, 92. In TransUnion LLC v. Ramirez, 594 U.S. 413 (2021), the Supreme Court clarified that "the mere risk of future harm, standing alone, cannot qualify as a concrete harm — at least unless the exposure to the risk of future harm itself causes a separate concrete harm."

5

Here, the Commission contends that Phillips has not sufficiently alleged such a separate harm. See ECF No. 11-1 (MTD) at 4 (citing TransUnion, 594 U.S. at 436–37).

The Court need not decide whether sharing PII on the dark web alone constitutes concrete harm because Plaintiff has pled that such sharing has materialized into actual attempts to steal his identity — namely, "the unauthorized opening of credit accounts in his name and online password breaches." Compl., ¶ 61; see also id., ¶ 17; ECF No. 13 (Opp.) at 6–7. He argues that such harm is sufficient to constitute an injury, see Opp. at 6–7, and the Court agrees. Defendant asserts that this is "general emotional harm" resulting from Plaintiff's unfounded anxiety, not separate concrete harm, see MTD at 4 (quoting Humane Soc'y of U.S. v. Babbitt, 46 F.3d 93, 98 (D.C. Cir. 1995)), but it is mistaken. Phillips is not tilting at windmills; on the contrary, by changing his passwords and closing accounts, he is reacting to the attempts of real criminals who are persistently trying to use his information. To the extent that the NRC asserts that Plaintiff would need to experience actual identity theft rather than mere attempts at such theft to establish sufficient risk to have standing, see id. at 5, the Court also disagrees. Defending against such attempts, he pleads, cost him time and resources. See, e.g., Compl., ¶¶ 13, 17, 61, 64. He has thus adequately pled that a concrete harm has developed from his general risk of identity theft.

      b.  Causation

Plaintiff, however, cannot establish standing without also proving that the Commission's internal posting caused the risk at issue. Our Circuit has explained that the defendant need not "be the most immediate cause, or even a proximate cause, of the plaintiffs' injuries; [causation] requires only that . . . injuries be 'fairly traceable' to the defendant." Attias v. Carefirst, Inc., 865

F.3d 620, 629 (D.C. Cir. 2017) (quoting Lexmark Intern., Inc. v. Static Control Components, Inc., 572 U.S. 118, 125 (2014)).

The NRC asserts that Phillips does not sufficiently allege causation because the causal chain between the SharePoint post and his increased risk of identity theft is too attenuated in that it relies on decisions made by independent actors. See MTD at 5–6. The Commission adds that Plaintiff started seeing his PII online about one year after the SharePoint post was published, which is also "far too great a gap in time to support a plausible inference of causation." ECF No. 15 (Reply) at 4 (citing Spence v. Dep't of Veterans Affs., 109 F.4th 531, 540 (D.C. Cir. 2024); Mayers v. Laborers' Health & Safety Fund of N. Am., 478 F.3d 364, 369 (D.C. Cir. 2007)).

The Complaint, however, ruled out alternative explanations for his injury that are unrelated to the NRC. Phillips alleges, for example, that he kept his PII close to the chest generally and had limited online activities other than submitting the NRC application. See, e.g., Compl., ¶ 30 ("Prior to being notified of his PII exposure in 2014, Plaintiff was never involved in any data breaches. Plaintiff was extremely protective of his personal data. He rarely engaged in online activities and monitored his credit closely through credit bureaus' credit monitoring services."). As a result of his "limited online activities . . . , overall protection of his personal data, and awareness of his data security," he clearly alleges that "the breach would not have happened but for [the] NRC's exposure of [his] PII." Id., ¶ 31. Accepting all of Plaintiff's allegations as true and drawing all reasonable inferences in his favor, there are limited avenues other than the SharePoint post through which his PII could have been exposed. In addition, Defendant's contention that the post has been removed and cannot now be causing harm, see MTD at 6, is akin to closing the barn door after the horse is gone. Phillips has thus done enough

7

at this stage to plausibly allege that the post led to the severe risk of identity theft that he now faces.

Defendant's chronological argument is unpersuasive for similar reasons. Its above-cited cases — where less than a year had passed between the alleged cause and injury but courts were nevertheless dubious of causation, see Spence, 109 F.4th at 540 (ten months); Mayers, 478 F.3d at 139 (eight to nine months) — are employment cases and do not concern the disclosure of protected information. The plaintiffs in those cases, moreover, failed to rule out intervening causes in their pleadings to the same degree that Phillips has. See Spence, 109 F.4th at 540; Mayers, 478 F.3d at 139. In both of those cases, the plaintiffs alleged retaliatory firings months after the filing of a complaint and the notification of a disability, yet they never dismissed other possible causes of their terminations and instead relied solely on timing to support their claims. See Spence, 109 F.4th at 540; Mayers, 478 F.3d at 139. That caused the Circuit in Spence to state that "[w]hen 'mere temporal proximity' is the only 'evidence of causality,' . . . 'the temporal proximity must be very close.'" 109 F.4th at 540 (quoting Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)).

Here, by contrast, to prove causation, Phillips does not allege that the two events were merely temporally proximate. He also pleads that there were reasons to doubt that his PII was released in any other way, thereby closing off other avenues connecting the two events. See Compl., ¶¶ 30–31. He has likewise explained why there might be an especially large time gap in this case. Citing a Government Accountability Office report, he states that "stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years." Id., ¶ 55 (citing Personal Information: Data Breaches Are Frequent, but Evidence of

8

<u>Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown</u>, U.S. Gov't Accountability Off. (June 2007)); see also id., ¶ 47 ("[O]nce PII has been disclosed, criminals often trade it on the 'cyber black-market,' or the 'dark web,' for many years."). Given this, Plaintiff has met his burden to plausibly allege that his increased risk of identity theft is traceable to the NRC.

        c.     Redressability

A plaintiff's burden to prove redressability at this stage of the litigation is "relatively modest." <u>Bennett v. Spear</u>, 520 U.S. 154, 170–71 (1997). The test "examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff." <u>Fla. Audubon Soc'y v. Bentsen</u>, 94 F.3d 658, 663–64 (D.C. Cir. 1996). Phillips seeks money damages that would compensate him for the harm he has faced because of the disclosure and resulting risk of identity theft that he has had to live with. Neither party contends that this injury cannot be redressed via this route.

\*     \*     \*

Having satisfied the three requirements for standing, Plaintiff may sue for damages for the legitimate risk of identity theft that he experienced. Because Phillips clearly has standing on this claim, the Court need not address standing for the other injuries on which he bases his damages request.

        2.    *Injunctive Relief*

To the extent that Phillips also demands injunctive relief in various forms, his request is either moot or unmeritorious or he does not have standing to seek this remedy. A plaintiff's standing to obtain an injunction "depend[s] on whether he [is] likely to suffer future injury" from the challenged action. See <u>City of L.A. v. Lyons</u>, 461 U.S. 95, 105 (1983). It is unclear exactly

what form of injunctive relief Plaintiff is seeking. At times, he asks for an order both restricting the NRC from publishing his data and requiring the NRC to implement enhanced data-security policies, see Compl., ¶ 18 ("Plaintiff does not have any ability to protect his PII that was or remains in Defendant's possession."); id. at 21–22 (requesting "relief designed to prevent Defendant from experiencing another data breach by adopting, implementing, and training personnel on best data security practices to safeguard PII and to provide or extend additional credit monitoring services and similar services to protect against all types of identity theft and medical identity theft"), as well as an injunction against unknown criminals from using his data. See, e.g., Opp. at 20 ("unknow[n] criminals continue to control the data, placing it at ongoing risk").

To the extent that he asks for an injunction prohibiting Defendant from further exposing his data, such request is moot because the SharePoint post has been removed. See Compl., ¶¶ 6, 28, 35. Phillips does not plausibly allege that the NRC is likely to disclose the information again, so there is no substantial chance of future injury. For those same reasons, his claim for injunctive relief in the form of an order requiring the establishment of further security measures falls short. As for the request to enjoin unknown criminals, the Court cannot offer redress against people Plaintiff has not even identified.

        3.    *Declaratory Relief*

To obtain declaratory relief, the moving party must show that there is a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Md. Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941). A court is generally justified in entering a declaratory judgment under two circumstances: 1) if the judgment will "serve a useful purpose in clarifying the legal relations at

issue," or 2) if the judgment will "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." President v. Vance, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980) (quoting E. Borchard, Declaratory Judgments 299 (2d ed. 1941)).  To have standing "[t]o pursue . . . a declaratory judgment," a plaintiff "must allege a likelihood of future violations of [his] rights" by the defendant.  See Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp., 28 F.3d 1268, 1273 (D.C. Cir. 1994).  As a result, the standing analysis for declaratory judgments typically follows that of injunctive relief.  See, e.g., NB *ex rel.* Peacock v. D.C., 682 F.3d 77 (D.C. Cir. 2012); see also Reply at 12.  As the Court has concluded that there is no likely chance of future injury from Defendant's actions in this case, Plaintiff also lacks standing to seek a declaratory judgment.

*   *   *

Now that standing has been resolved, the Court may at last move to the merits.

B.    Privacy Act

The Privacy Act details: "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains." 5 U.S.C. § 552a(b).  Remedies for this violation are governed by 5 U.S.C. § 552a(g)(1)(D), which states that the Government may be liable for civil damages if a federal agency "fails to comply with any . . . provision of [the statute] . . . in such a way as to have an adverse effect on an individual."  In any suit brought under this subsection, it must be determined that the agency (1) violated the Act (2) in a way that "was intentional or willful," and (3) had an adverse effect on the plaintiff.  Id. §§ 552a(g)(1)(D)–(g)(4).  The parties agree that to be intentional or willful, an agency's actions "must be so patently egregious and unlawful that

11

anyone undertaking the conduct should have known it unlawful." Reply at 17 (quoting Rtskhiladze v. Mueller, 110 F.4th 273, 278-79 (D.C. Cir. 2024)); Opp. at 27 (quoting Maydak v. United States, 630 F.3d 166, 179 (D.C. Cir. 2010)).

The Commission contends that Plaintiff's Privacy Act claim is deficient because he does not allege that its actions were intentional or willful. See MTD at 20 (quoting Compl., ¶¶ 5–6, 28); Reply at 12–25. Instead, Defendant argues, Phillips has made the case only that the SharePoint post was a mistake and "a result of Defendant's negligence." MTD at 20. In the Complaint, Plaintiff alleges that the Commission uploaded documents that it knew contained his PII to a SharePoint site accessible to all employees. See Compl., ¶ 6. He pleads that Defendant was fully aware of the growing trend of data breaches targeting government agencies in similar circumstances. Id., ¶¶ 39–49. The NRC, he continues, nevertheless neglected to adopt adequate protective measures or even notice that it had stored the PII of applicants on its server without proper access restrictions for over 10 years. Id., ¶¶ 7, 32, 42; see also Opp. at 28, 31. Is this "patently egregious"?

Caselaw helps to answer that question. In a case with parallels to this one, plaintiffs sued the Office of Personnel Management under the Privacy Act after a cyberattacker gained access to their data. See In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig., 928 F.3d 42 (D.C. Cir. 2019). Like here, the plaintiffs there claimed that OPM had not properly secured their PII. Id. at 49. OPM oversees more than two million background checks and security-clearance investigations annually, which means that it possesses the PII of many people and their contacts, including "birth dates, Social Security numbers, residency details, passport information, fingerprints, and other records pertaining to employees' criminal histories, psychological and emotional health, and finances." Id. at 50. Annual audits of OPM began in 2007 to "identif[y]

major information security deficiencies that left [it] vulnerable to attack," yet it ignored many of the post-audit security recommendations. Id. at 51. After experiencing cyberattacks both two and five years before the incident at issue, moreover, the agency was on notice that it was at risk of such attacks. Id. at 50.

In reversing the district court's dismissal of the plaintiffs' Privacy Act claim, the Circuit held that OPM willfully violated the Act because it "had long known that its . . . systems were prime targets for hackers" and yet "effectively left the door to its records unlocked by repeatedly failing to take basic, known, and available steps" to secure its information. Id. at 63; see also Am. Fed'n of Gov't Emps. v. Hawley, 543 F. Supp. 2d 44, 52 (D.D.C. 2008) (denying motion to dismiss because Department of Homeland Security's failure to establish safeguards to prevent losing computer hard drive was "intentional and willful" given Inspector General's repeated warnings of "recurring, systemic, and fundamental deficiencies" in agency's information security); In re Dep't of Veterans Affs. (VA) Data Theft Litig., 2007 WL 7621261, at *4–5 (D.D.C. Nov. 16, 2007) (denying motion to dismiss because Department of Veterans Affairs' failure to establish appropriate safeguards to protect against theft of laptop and hard drive was "intentional and willful" in light of Government Accountability Office's numerous warnings of "deficiencies" in agency's "information security").

Phillips also compares his case to that of Beaven v. DOJ, 622 F.3d 540 (6th Cir. 2010), where the plaintiff, a prison employee, alleged that the defendants had allowed a roster containing "employees' names, addresses, Social Security numbers, home telephone numbers, pay grades, and other personal information" to be left on a table where inmates roamed. See id. at 544–45; Opp. at 30–31. The Sixth Circuit — reversing a trial judgment — held that such actions were intentional within the meaning of the Privacy Act. See 622 F.3d at 544–45.

13

Despite the results in these cases, this Court does not believe that following suit is warranted here. Unlike in In re OPM, Phillips has alleged only that data breaches were generally on the rise, so the Commission should have been on notice of the issue, see Compl., ¶ 46 ("The significant rise in data breaches have been a consistent problem for the past several years, providing Defendant sufficient time and notice to improve the security of its systems."), not that the NRC itself had experienced previous cyberattacks that should have made it aware of its particular security weaknesses nor that it ignored any recommendations to implement security measures. As the NRC, moreover, did not possess even close to the same amount of PII as OPM, the level of care that it should be expected to have employed for such PII is lower. Similarly, although the agency left Plaintiff's information out in the open on the SharePoint, as did the defendants in Beaven, the only people who had direct access to Phillips's PII were employees of the federal government (as opposed to inmates), who — if they ever actually saw the SharePoint post — regularly handle confidential information. Beaven thus does not counsel a different outcome.

Phillips has cited no cases in which negligent handling of PII without any advance warning of a potential breach qualified as intentional or willful. On the contrary, courts have stated that similar agency actions were not willful. In Asylum Seekers Trying to Assure their Safety v. Lechleitner, 2023 WL 8619411 (D.D.C. Dec. 13, 2023), for example, an employee of U.S. Immigration and Customs Enforcement mistakenly posted information concerning 6,252 noncitizens currently or formerly in ICE custody to the agency's public website. Id. at *1. The agency removed the information when the breach was discovered five hours later. Id. at *1–2. In granting the defendants' motion to dismiss, the court found that nothing in the plaintiffs' pleadings suggested that this exposure was willful. Id. at *8. While the information on the

14

NRC's SharePoint was up for a decade — which is dramatically more significant than a mere five hours of exposure — the SharePoint was internal, and Phillips does not allege either that the agency was put on notice of the post and ignored it or that he belongs to an especially vulnerable population, like noncitizens, who would be uniquely injured by their information's exposure.

Phillips may be correct that the Commission should have generally been aware of the rise in data breaches, but the Court cannot find that its negligence was so patently egregious as to rise to the required level of intent. Plaintiff's suit under the Privacy Act will thus be dismissed.

## IV. Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion to Dismiss. A separate Order so stating will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
Chief Judge

Date: March 31, 2025